**BOISE CASCADE CORPORATION, COMPOSITE CAN DIVISION, Petitioner,**

v.

**SECRETARY OF LABOR AND OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent.**

No. 77–2201.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 11, 1982.

Decided Dec. 10, 1982.

---

Warren C. Jones, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, Idaho, for petitioner.

Dennis Kade, U.S. Dept. of Labor, Washington, D.C., argued for respondent; William J. Kilberg, Sol. of Labor, Dept. of Labor, Washington, D.C., on brief.

Before BROWNING, Chief Judge, CHAMBERS and HUG, Circuit Judges.

HUG, Circuit Judge:

Boise Cascade Corporation petitions for review of a decision of the Occupational Safety and Health Review Commission enforcing a citation for violation of occupational noise standards. The Secretary of Labor cited the company for failure to install engineering and administrative controls to abate noise levels and failure to implement a hearing conservation program. We affirm the determination that Boise Cascade violated the standard and the requirement that it institute an effective hearing conservation program. Because the Secretary failed to prove that feasible engineering controls exist, we vacate the portions of the citation requiring implementation of such controls.

Boise Cascade Corporation operates a plant in Turner, Kansas,[1] at which composite cans are formed.[2] Approximately 125 persons are employed at the plant.

In February, 1972, an Occupational Safety and Health Administration ("OSHA") industrial hygienist inspected the plant to determine the employees' noise exposure. He recorded noise levels in excess of the 90 dBA level permitted under the applicable OSHA standard, 29 C.F.R. § 1910.95 (1981). Based on the hygienist's observations, the Secretary issued a citation on March 6, 1972, alleging a violation of 29 C.F.R. § 1910.95. The citation noted violations in two different work areas. The first was the area where punch presses were located. The second area contained automatic seamers, hand seamers, and winders.[3]

Boise Cascade contested the citation. At a hearing before an Administrative Law Judge ("ALJ"), the company conceded that the punch presses produced noise in excess of permissible levels, but argued that punch press workers were adequately protected by the requirement that they wear earplugs. As evidence of its good faith, the company presented testimony as to its efforts to develop prototype engineering controls for the punch presses. Boise Cascade denied that the remaining equipment produced noise in excess of permissible levels, and challenged the technique by which the hygienist had made his observations. It presented expert witnesses who described appropriate sound measurement techniques.

The ALJ found that the hygienist's testimony was sufficient evidence to support the citation. He determined that noise levels in all pertinent plant areas had exceeded 90 dBA during approximately seven hours of the regular workday. He concluded Boise

1. A "person adversely affected or aggrieved by an order of the Commission" may seek review of the order in "any United States Court of Appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office." 29 U.S.C. § 660(a). Our jurisdiction is based on the location of Boise Cascade's principal office in Boise, Idaho.

2. Composite cans are formed from cardboard tubes with metal plates on either end.

3. A third group of machines, the hand caulkers and the convolute winder, was also alleged by the Secretary to exceed permissible noise levels. That portion of the citation was vacated by the ALJ, and is not now in issue.

Cascade had not implemented an effective hearing conservation program to protect its workers, and that protection through administrative controls was not feasible. Finally, the ALJ concluded that Boise Cascade's efforts to design engineering controls for the punch presses had confronted the company with "enormous problems." In view of the developmental difficulties and the company's apparent good faith, the ALJ expanded the schedule for implementation of engineering controls. He did order, however, that "Respondent shall, by June 1, 1975, complete feasible equipment and/or facility modifications to attenuate those areas wherein excessive noise was found."

Boise Cascade sought review by the Commission under 29 U.S.C. § 661(i). The following issues were specified for Commission review:

(1) Whether the evidence adduced in this case establishes a violation of the Act for noncompliance with 29 C.F.R. § 1910.95.

(2) Whether 29 C.F.R. § 1910.95(b)(1) requires the employer to utilize feasible engineering or administrative controls if personal protective equipment used by the employees reduces the sound levels to that required by Table G–16.

(3) Whether 29 C.F.R. § 1910.95(b) is so vague as to be unenforceable.

The Commission affirmed the ALJ's conclusion that the OSHA hygienist's testimony provided sufficient credible evidence that noise levels exceeded permissible standards.[4] The second issue—whether personal protective equipment could be used in lieu of administrative or engineering controls—was not reached, because the Commission determined that Boise Cascade had not implemented and enforced a protective equipment program.[5] Finally, the Commission held that the standard outlined in 29 C.F.R. § 1910.95 is not unenforceably vague. It pointed to Boise Cascade's efforts at compliance as evidence that the standard is understandable.[6]

Following the Commission's decision, Boise Cascade removed the punch presses from the plant. The parties agree that only the portions of the citation concerning the winders and seamers are at issue in this appeal.

In this enforcement action, our jurisdiction to review the Commission's decision is provided by 29 U.S.C. § 660(a) and by 5 U.S.C. § 706. *Titanium Metals Corp. of America v. Usery,* 579 F.2d 536, 540 & n. 2 (9th Cir.1978); *Brennan v. OSHRC,* 511 F.2d 1139, 1141 (9th Cir.1975). We must affirm the Commission's finding that Boise Cascade violated 29 C.F.R. § 1910.95 if that finding is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a).

Boise Cascade first challenges the finding of the ALJ, affirmed by the Commission, that its equipment produced noise in excess of permissible levels as set out in Table G–16 of 29 C.F.R. § 1910.95. At the administrative hearing, the Secretary bore the burden of proof on this issue; he was required to prove the violation by a preponderance of the evidence. *See* 29 C.F.R. § 2200.73(a) (1981); *B & B Insulation, Inc. v. OSHRC,* 583 F.2d 1364, 1372 (5th Cir. 1978); *Marshall v. Knutson Constr. Co.,* 566

---

4. Chairman Barnako and Commissioner Cleary signed the Commission's decision. Commissioner Moran dissented, concluding that the "citation should be vacated in its entirety because the evidence is insufficient to establish that respondent's employees were exposed to prohibited noise levels."

5. In the punch press area, where Boise Cascade conceded noise levels exceeded 90 dBA, use of earplugs or muffs by employees was mandatory. However, the hygienist noted that several punch press operators either did not wear earplugs or wore them improperly.

Because Boise Cascade believed that the winders and seamers did not produce sound in excess of permissible levels, operators of those machines were not required to wear earplugs. However, the company did make them available for optional use.

6. Although the Commission generally affirmed the ALJ's decision, it held he had erroneously modified the substantive provisions of the abatement plan ordered by the citation.

F.2d 596, 599 (8th Cir.1977); *Olin Constr. Co. v. OSHRC*, 525 F.2d 464, 466–67 (2d Cir.1975) (per curiam). To satisfy this burden as to the existence of a violation, the Secretary provided the testimony of the OSHA industrial hygienist, Albert Stewart. Stewart made an inspection tour of the plant, accompanied by a Boise Cascade executive who identified each piece of equipment and the operator's normal work station. He acquired sound level readings by placing the microphone "perpendicular to the noise and directed towards the ear of the employee who is either standing or sitting [in the normal operating position at the machine]." Generally, readings were taken approximately three inches from each of an employee's ears. Stewart considered the pattern of the employee's movement in operating the machines and observed the cycle of functions performed by the equipment. He testified that none of the winder or seamer operators wore earplugs or other protective equipment. He estimated he spent 20 to 25 minutes taking readings in that area of the plant. The Secretary also produced evidence of the accuracy and reliability of the equipment employed by Stewart.

Boise Cascade tried to refute Stewart's testimony in two ways. It first produced evidence to challenge Stewart's testing methods. Carleton Wold, the company's Corporate Noise Control Consultant, testified that Stewart erred in holding the microphone so close to the employees' ears, because the skull reflects the sound and distorts the reading. In Wold's opinion, the better testing method is to move the sound level meter in an arc 10 to 15 inches from the employee's head, to prevent sound reflection.[7]

The ALJ found Wold's testimony insufficient to rebut the Secretary's prima facie case. He noted that Wold's survey, which showed noise within permissible levels, was for engineering purposes rather than employee protection. He observed that although Wold was critical of Stewart's failure to consider the effect of sound reflection from employees' skulls, Wold had not considered whether this factor affected his own readings. In addition, the ALJ noted that Wold's testimony did not establish the accuracy and reliability of his equipment.

Boise Cascade also claimed that Stewart had taken "grab samples," resulting in a survey that was too brief to be accurate and that he failed to consider the machinery's intermittent cycles. Company executives testified that because the machines did not produce steady noise levels, and because mechanical difficulties resulted in calculable periods of downtime, employees were not exposed to noise in excess of 90 dBA for eight hours each day. Boise Cascade therefore asserted that because exposure to more than 90 dBA for eight hours' duration had not been shown, the evidence was insufficient to establish a violation.[8]

The ALJ found that Stewart's survey was not based on grab samples, but that "[c]onsidering the number of locations surveyed by Mr. Stewart, his obtaining of collateral information from Respondent's managerial representative, his expertise, and further considering his most detailed testimony as to the locations and the various sound levels recorded by him, it is felt that Mr. Stewart's evidence on this issue is more credible and more probative than that of the Respondent." The ALJ further determined that the mechanical cycles of the winders and seamers was such that when

---

**7.** Boise Cascade also presented the testimony of Cleo Williams, a safety consultant employed by the company's insurer. Williams made a sound survey shortly after that done by Stewart; Williams's survey recorded sound levels within permissible levels. The ALJ discounted Williams's testimony, concluding that there was no showing that his equipment was accurate and reliable and that he lacked the expertise to provide opinion evidence on testing methods.

**8.** The ALJ excluded evidence of the average efficiency rates of various machines, which was offered to show evidence of downtime. The Commission reviewed the proffered evidence, and concluded that "[e]ven if the average breakdown time figure based on the overall plant efficiency was accepted, the duration of employee exposure is not sufficiently reduced to alter the result."

they were operated simultaneously, each machine's peak noise level became indistinguishable from the background noise, so that the noise level of the machines was not intermittent.

■ We will not reverse the ALJ's credibility judgment, or the testimonial inferences on which it is based. *See Zurn Industries, Inc. v. NLRB,* 680 F.2d 683, 694 (9th Cir.1982); *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078 (9th Cir.1977). Substantial evidence supports the finding that the winders and seamers produced noise in excess of permissible levels, and we affirm that determination.

■ The citation ordered implementation of feasible administrative and engineering controls.[9] The ALJ found that administrative controls were not feasible and this finding was implicitly affirmed by the Commission.[10] Therefore, the issue of the feasibility of administrative controls is not before us on Boise's appeal. Feasibility is a question of fact reviewable under the substantial evidence standard. *Donovan v. Castle & Cooke Foods,* 692 F.2d 641 at 647 n. 8 (9th Cir.1982); *see Diversified Industries Division, Independent Stave Co. v. OSHRC,* 618 F.2d 30, 32 (8th Cir.1980).

■ Where the employer is cited for failing to implement feasible engineering controls it is the Secretary's burden to show that engineering controls are both technologically and economically feasible. *Castle & Cooke,* at 647, 649; *Carnation Co. v. Secretary of Labor,* 641 F.2d 801, 803 (9th Cir.1981). Neither the ALJ nor the Commission made a specific finding that engineering controls were feasible, but that conclusion was implicit in their decisions. The Commission enforced the regulation without requiring further proof of feasibility, perhaps assuming the Secretary had carried his burden on this issue in promulgating the regulation. It is established, however, that the Secretary must prove the feasibility of controls, both in promulgating regulations and again in enforcing them.

■ In promulgating a standard, the Secretary is not restricted to the state of the art in the regulated industry. He may impose requirements that force technological development beyond what the industry is presently capable of producing. *See United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1264 (D.C.Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 31, 48, 69 L.Ed.2d 997 (1981); *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1333 (6th Cir.1978); *American Iron & Steel Inst. v. OSHA,* 577 F.2d 825, 838 (3d Cir.1978), cert. dismissed, 448 U.S. 917, 101 S.Ct. 38, 65 L.Ed.2d 1180 (1980); *Society of Plastics Indus., Inc. v. OSHA,* 509 F.2d 1301, 1309 (2d Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). The standard may require implementation of technology which is merely "looming on today's horizon." *American Iron & Steel Inst.,* 577 F.2d at 838. "So long as [the Secretary] presents

---

**9.** Engineering controls are those that reduce the sound intensity at the source of the noise. This is achieved by insulation of the machine, by substituting quieter machines and processes, or by isolating the machine or its operator.

Administrative controls attempt to reduce workers' exposure to excess noise through use of variable work schedules, variable assignments, or limiting machine use. *See* United States Department of Labor, *Guidelines to the Department of Labor's Occupational Noise Standards for Federal Supply Contracts* (1970).

**10.** The form of administrative controls suggested by the Secretary was the assignment of machine operators to split positions, so that only a portion of each day was spent at the winders and seamers. Boise Cascade execu-

tives testified that split assignments would violate the seniority provisions of their agreement with the union. Machine operator positions required skill and training, and were desirable because of the pay rate. Qualified workers were allowed to bid for operator positions, which were awarded on the basis of seniority. The company contended that assigning operators to lower-paying, non-operator positions for several hours each day would violate the seniority agreement. In addition, less skilled workers would have to be used as machine operators for part of each day, endangering worker safety. The Secretary offered virtually no evidence to refute these claims, merely noting that the union would have to be "cooperative," and share the burden of worker protection.

substantial evidence that companies acting vigorously and in good faith can develop the technology, OSHA can require industry to meet [standards] never attained anywhere." *United Steelworkers,* 647 F.2d at 1264–65 (footnote omitted). *See* 29 U.S.C. § 655(f).

■ In an enforcement proceeding, the Secretary's burden as to technological feasibility is of a different character. It must be established that specific, technically feasible controls exist to abate the violation. *See Diebold,* 585 F.2d at 1333; *National Realty & Constr. Co. v. OSHRC,* 489 F.2d 1257, 1268 (D.C.Cir.1973). Nothstein, *The Law of Occupational Safety and Health,* 438 (1981) describes the Secretary's burden as follows:

> To prove that an employer violated a standard, the Secretary of Labor must at the very least demonstrate that, at the time of the alleged violation, a technologically feasible method of abatement existed.... However ... the Commission, while holding that employers may not be found in violation of a standard if the technology for compliance does not exist, [has] stated this does not mean that the Secretary of Labor must prove that "off the shelf" controls were available to the employer at the time of the violation. Rather it is sufficient to show the existence of technology that could be adapted to the employer's operations (feasible at the time the employer allegedly violated the standard).

(Citations omitted.) *See also Marshall v. West Point Pepperell, Inc.,* 588 F.2d 979, 981, 985 (5th Cir.1979) (although it is not necessary that "controls have been fully developed and marketed by disinterested third parties," a control is not feasible if it "exists only in the realm of theory.").

■ The Secretary can thus satisfy his burden at the time of enforcement by showing that effective controls have been installed on the same or similar equipment by other members of the industry. In *Diversified Industries,* it was held that technological feasibility was established where an expert "testified that she was familiar with woodworking machines generally and with technical literature concerning the abatement of their noise. She had seen engineering controls successfully implemented on a machine similar to Diversified's planer." 618 F.2d at 34. In *RMI Co. v. Secretary of Labor,* 594 F.2d 566 (6th Cir.1979), the court reluctantly affirmed a finding of technological feasibility on a showing that the Secretary recommended a specific type of acoustical enclosure to be placed around machines. Id. at 569, 571. The Secretary established technological feasibility in *Castle & Cooke* with the testimony of acoustical experts who testified that specific engineering controls were presently available to abate noise levels. Id. at 647.

■ The Secretary offered no such proof of technical feasibility in this case. His proof of the violation was limited to Stewart's testimony regarding impermissible noise levels. A thorough reading of the record reveals no specific suggestion as to how the winders and seamers could be modified and no indication that other industry members have implemented satisfactory controls. The Secretary contends on appeal that Boise Cascade's own evidence provided proof of feasibility. That evidence, however, principally concerned the now-abandoned punch presses. The only reference to the winders and seamers was made by Carleton Wold, who testified to a "recollection" that "[t]here were some [modifications] put into the other areas of the plant, the winders and some other areas." There is no more detailed description of what modifications were implemented or what their effectiveness was. Clearly the Secretary's reliance on this testimony is misplaced.

■ We therefore vacate the portion of the citation requiring implementation of engineering controls, on the ground that the Secretary failed to provide substantial evidence that such controls were technologically feasible. We affirm the Commission's determination that Boise Cascade's winders and seamers produced noise levels that violated the standard. We also affirm the requirement that a satisfactory hearing conservation program be developed. The evidence established that winder and seam-

er operators were not required to wear personal protective equipment. 29 C.F.R. § 1910.95(b)(1) requires use of protective equipment where feasible engineering and administrative controls do not exist. In addition, Boise Cascade failed to maintain an appropriate hearing conservation program as required by section 1910.95(c). Although the company made audiometric testing available to employees, apparently no regular program for hearing protection was available. Employees were not instructed on the use, care, or fitting of the earplugs, nor were supervisors trained to help employees. Because noise levels at the plant do exceed permissible standards, and because the Secretary stipulates that the proper use of earplugs will attenuate noise approximately 30 dBA, development of an effective program is critical to the protection of Boise Cascade's employees.

As technology develops, engineering controls may well become feasible in the future. Nothing in this opinion should be construed so as to absolve the employer from the continuing obligation to search for feasible engineering controls to protect the hearing of its employees.

The order of the Commission enforcing the citation is AFFIRMED in part, VACATED in part.