692 F.2d 641
 68 A.L.R.Fed. 717, 10 O.S.H. Cas.(BNA) 2169,
1982 O.S.H.D. (CCH) P 26,312
 Raymond J. DONOVAN, Secretary of Labor, Petitioner,
v.
CASTLE & COOKE FOODS, A DIVISION OF CASTLE & COOKE, INC.,
and Occupational Safety and Health Review
Commission, Respondents.
 No. 77-2565.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1982.
Decided Nov. 19, 1982.
 
 Dennis Kade, Dept. of Justice, Washington, D.C., for petitioner.
 Hugh Shearer, Goodswill, Angerson & Quinn, Honolulu, Hawaii, for respondents.
 On Petition to Review an Order of the Occupational Safety and Health Review Commission.
 Before BROWNING, Chief Judge, and CHAMBERS and HUG, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 Regulations promulgated pursuant to the Occupational Safety and Health Act (the "Act"), 29 U.S.C. Secs. 651-678, require employers to install feasible engineering or administrative controls to protect employees from exposure to harmful noise levels. The Secretary of Labor cited Castle & Cooke Foods, Inc. for violation of this regulatory standard. The Occupational Safety and Health Review Commission vacated the citation, concluding that the cost of the proposed engineering controls was not justified by the benefits to be gained by affected employees. The issue presented by the Secretary's petition for review is whether the Act authorizes the application of a cost-benefit analysis to determine what noise controls are feasible. We hold that the Act and the occupational noise regulations do permit consideration of relative costs and benefits, and we affirm the order vacating the citation.
 
 
 2
 Castle & Cooke Foods, Inc. ("Castle & Cooke") operates a pineapple cannery in Honolulu, Hawaii. The company maintains its own can plant in conjunction with the cannery. At that facility metal cans are manufactured from sheet metal. The can plant supplies all the cans necessary to Castle & Cooke's Hawaiian operation, as well as producing excess cans available for distribution to other local canneries. With seasonal variations, 210 to 350 persons are employed in the can plant. Additional employees affected by this appeal work in the cannery and frozen produce sections of the plant.
 
 
 3
 An Occupational Safety and Health Administration ("OSHA") compliance officer inspected the can plant and cannery on several occasions during 1974. The officer found that machinery in the can plant, and in the frozen produce and contract packing areas of the cannery, produced noise in excess of levels permitted by OSHA regulations. As a result, Castle & Cooke was cited for a nonserious violation of 29 C.F.R. Sec. 1910.95 (1981). That regulation, in Table G-16, specifies the noise levels to which employees may be exposed and the duration of exposure. The regulation also specifies, in section (b)(1), the methods of abating excess noise.[1] The citation charged that Castle & Cooke was in violation of this regulation because "[f]easible engineering or administrative controls have not been used to the extent possible where employees were subjected to sound [levels] exceeding those listed in Table G-16."
 
 
 4
 In contesting the citation, Castle & Cooke neither challenged the validity of the noise levels specified in Table G-16 nor disputed that its machinery produced noise in excess of permissible levels. Instead, its defense focused upon permissible means of protecting employees from excess noise. The Secretary, relying on 29 C.F.R. Sec. 1910.95(b)(1), insisted that the alleged violation could only be abated through implementation of engineering or administrative controls.[2] Castle & Cooke's defense was based on the fact, not contested by the Secretary, that it required its employees to wear personal protective equipment (specifically, ear plugs and ear muffs provided by the employer). In Castle & Cooke's view, use of personal protective equipment, in conjunction with a plant-wide hearing conservation program, adequately protected employees from exposure to excess noise. The company therefore argued that 29 C.F.R. Sec. 1910.95(b)(1), which favors one means of employee protection over another, is invalid because the preference for engineering and administrative controls exceeds statutory authority and lacks a reasonable basis in fact.
 
 
 5
 The Secretary did not dispute Castle & Cooke's claim that it enforced a mandatory program for employee use of personal protective equipment. He contended, however, that the regulatory preference for engineering and administrative controls was valid because ear plugs and ear muffs were a less effective means of protecting employees from excess noise levels. He therefore argued that Castle & Cooke's failure to install engineering controls constituted a violation of a valid OSHA standard, and that the violation could only be abated by the implementation of such controls.[3]
 
 
 6
 At a hearing before an administrative law judge, the Secretary presented the testimony and written report of B. Andrew Kugler, an acoustical consultant. Mr. Kugler concluded that technologically feasible engineering controls were available for installation at the can plant and cannery. His testimony did not address the cost or economic impact of installing such controls. In addition, he noted that the proposed engineering controls might not reduce the noise within the can plant to levels required by Table G-16. The Secretary rested his case with the presentation of Mr. Kugler's testimony.
 
 
 7
 Castle & Cooke also presented testimony and documentary evidence by an acoustical consultant, Edward L. Pack. Mr. Pack agreed that it was technologically feasible to isolate the company's equipment by enclosing the machines in engineering controls that would significantly reduce noise levels outside the enclosures. The Pack report also analyzed the potential costs of implementing such controls, concluding that the costs of development and installation would total approximately $700,000, and that there would be an additional annual cost impact of approximately $250,000 on Castle & Cooke's production.
 
 
 8
 Castle & Cooke claimed that the proposed enclosures would interfere with machine maintenance and operation, and thus result in a significant loss of production. It supported this claim with the testimony of the can plant manager, the cannery manager, and the company's regional comptroller. The company also offered testimony that the increasing costs of processing pineapple in Hawaii had reduced the size and number of processing operations, so that imposing the additional cost of the proposed engineering controls threatened both the industry and the state's economy.
 
 
 9
 Other witnesses for Castle & Cooke, the company's medical director and head nurse, described the hearing conservation program and the methods by which ear plugs and ear muffs are provided and fitted. Castle & Cooke's final witness was Dr. Charles P. Lebo, a physician specializing in otolaryngology. Dr. Lebo testified that in his opinion ear plugs and ear muffs, when properly fitted and regularly used, were capable of attenuating noise to safe levels. He contested the Secretary's assertions that these personal protective devices are inadequate forms of protection because they are difficult to fit, induce ear and skin disease, and are uncomfortable for most employees.
 
 
 10
 In rebuttal to Dr. Lebo's testimony, the Secretary offered the opinion of his expert, Dr. John L. Fletcher, a professor of otolaryngology. Dr. Fletcher testified that engineering or administrative controls would be more effective than hearing conservation programs (including use of personal protective equipment) in preventing hearing loss.
 
 
 11
 Based on this evidence, the administrative law judge rejected Castle & Cooke's claim that the preference for engineering controls violated due process because it lacked a substantial relationship to the goal of protecting employees. He concluded, however, that the requirement of "feasible engineering controls" was so vague as to be unenforceable, in that it "compels employers to guess at their peril what controls will be subjectively considered economically feasible." (Emphasis in original.) As a result, the citation was vacated.
 
 
 12
 The Occupational Safety and Health Review Commission (the "Commission") affirmed the administrative law judge's order on an alternate basis. The Commission reasoned that in order to determine if the proposed engineering controls were economically feasible, it is necessary "realistically [to] consider the hazard presented by excessive noise and determine whether the health benefits to employees from noise reduction justify the cost to the employer." It determined that this approach was particularly appropriate in the area of noise control, for requiring employers to expend unreasonable amounts to protect workers against non-life-threatening occupational hazards would diminish employers' ability to effectively abate more serious risks. The Commission then compared the administrative law judge's findings on the relative costs of engineering controls and personal protective equipment. It concluded that although implementation of engineering controls would provide some protection to Castle & Cooke employees, the benefits to be gained do not justify the cost of the controls.[4]
 
 
 13
 On appeal, the Secretary strenuously objects to the Commission's application of a cost-benefit analysis. He would have this court adopt the rule that proposed controls are infeasible only if their implementation would so seriously jeopardize the employer's economic condition as to threaten continued operation. He construes 29 C.F.R. Sec. 1910.95(b)(1) as requiring that if the employer fails to prove infeasibility under this test, engineering controls are required even if they do not assure achievement of sound levels designated in Table G-16 and even if use of personal protective equipment without engineering controls attenuates noise to Table G-16 levels.
 
 
 14
 In this enforcement action, our jurisdiction to review the agency's decision is provided by 29 U.S.C. Sec. 660(a) and (b) and by 5 U.S.C. Sec. 706. Titanium Metals Corp. of America v. Usery, 579 F.2d 536, 540 & n. 2 (9th Cir.1978); Brennan v. OSHRC, 511 F.2d 1139, 1141 (9th Cir.1975). We must uphold the agency's decision, unless we find it to be arbitrary and capricious, not in accordance with the law, or in excess of the authority granted by the Act. Id.; see also Pratt & Whitney Aircraft, Division of United Technologies Corp. v. Secretary of Labor, 649 F.2d 96, 103 (2d Cir.1981); Arkansas-Best Freight Systems, Inc. v. OSHRC, 529 F.2d 649, 653 (8th Cir.1976); Nothstein, The Law of Occupational Safety and Health, 533 (1981). Generally we accord substantial weight to the Secretary's interpretation of his own regulation, when affirmed by the Commission. Lloyd C. Lockrem, Inc. v. United States, 609 F.2d 940, 943 (9th Cir.1979); Irvington Moore, Inc. v. OSHRC, 556 F.2d 431, 434 (9th Cir.1977). However, in a case such as this, where the Secretary and the Commission disagree as to the meaning and application of the regulation, we need not grant such deference to the Secretary's interpretation. Marshall v. Anaconda Co., 596 F.2d 370, 374 (9th Cir.1979). Instead, we defer to the Commission's expertise in exercising the independent adjudicatory function assigned it by the Act. See Brennan v. OSHRC, 511 F.2d at 1141; Marshall v. Cities Service Oil Co., 577 F.2d 126, 131 (10th Cir.1978); Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255, 1261-62 (4th Cir.1974).
 
 
 15
 Our review requires analysis of both the regulation in question and the statutes on which the Secretary relied in promulgating the regulation. Section 6(a), 29 U.S.C. Sec. 655(a), charges the Secretary with the responsibility of promulgating occupational safety and health standards.[5] Section 3(8), 29 U.S.C. Sec. 652(8), explains the nature of the standards to be promulgated. Section 3(8) provides:
 
 
 16
 The term "occupational safety and health standard" means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment. (Emphasis added.)
 
 
 17
 Therefore, underlying the term "occupational health and safety standard" is the requirement that it be "reasonably necessary or appropriate."
 
 
 18
 Section 6(a) provides for two ways in which an occupational safety and health standard may be determined. First, it may be a "national consensus standard";[6] second, it may be any "established Federal standard." A third method of determining the standard is through typical administrative rulemaking procedures, which are specified in section 6(b)(1)-(4), 29 U.S.C. Sec. 655(b)(1)-(4).
 
 
 19
 The occupational safety and health standard that is involved in this case is an "established Federal standard," which is defined in section 3(10), 29 U.S.C. Sec. 652(10), as follows:
 
 
 20
 The term "established Federal standard" means any operative occupational safety and health standard established by any agency of the United States and presently in effect, or contained in any Act of Congress in force on December 29, 1970.
 
 
 21
 The standard at issue here was adopted from a standard established under the rulemaking power granted the Secretary by the Walsh-Healy Public Contracts Act, 41 U.S.C. Sec. 35. See 41 C.F.R. Sec. 50-204.10. The specification of permissible noise exposure levels in Table G-16, and the designated means of compliance in section 1910.95(b)(1), constituted an "established Federal standard" in effect at the time of its adoption as an OSHA standard.
 
 
 22
 The authority to promulgate the regulation was thus derived from section 6(a), section 3(8), and section 3(10) of the Act, 29 U.S.C. Secs. 655(a), 652(8), and 652(10).[7] This occupational safety and health standard must be interpreted in a manner consistent with these statutes. The crux of this case is, therefore, to determine how the requirement of "feasible" engineering controls, set forth in section 1910.95(b)(1), should be interpreted so as to be consistent with the governing statutes.
 
 
 23
 Feasibility has been consistently interpreted to comprise two facets: a standard must be both technologically and economically feasible. See United Steelworkers v. Marshall, 647 F.2d 1189, 1264 (D.C.Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); Diversified Industries Division, Independent Stave Co. v. OSHRC, 618 F.2d 30, 32 (8th Cir.1980); American Iron and Steel Institute v. OSHA, 577 F.2d 825, 832 (3d Cir.1978), cert. granted, 448 U.S. 909, 100 S.Ct. 3054, 65 L.Ed.2d 1139, cert. dismissed, 448 U.S. 917, 101 S.Ct. 38, 65 L.Ed.2d 1180 (1980). The Commission found that engineering controls were technologically feasible in this case. It relied upon the testimony of both the Secretary's expert, Mr. Kugler, and of Castle & Cooke's expert, Mr. Pack, who stated that "specific engineering methods were presently available to significantly reduce the noise levels in [the can] plant." Our review of the record shows that substantial evidence supports the finding that the proposed controls were technologically feasible.[8]
 
 
 24
 The determination of economic feasibility raises more difficult legal and factual questions. The Secretary contends that neither the Commission nor this court is free to interpret "economic feasibility," because its definition is controlled by the Supreme Court's decision in American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). We disagree.
 
 
 25
 In American Textile, representatives of cotton industry employers challenged proposed regulations limiting permissible exposure levels to cotton dust. Because cotton dust is a harmful physical agent that causes serious and disabling respiratory diseases, the Secretary promulgated the proposed regulation under Section 6(b)(5) of the Act, 29 U.S.C. Sec. 655(b)(5). That section requires that the Secretary "set the standard which most adequately assures, to the extent feasible ... that no employee will suffer material impairment of health ...." (Emphasis added.) The industry contended that the Secretary had not shown that the proposed standards were economically feasible, because he had not established that the cost impact of stricter cotton dust exposure standards bore a reasonable relationship to the anticipated benefits to employees.
 
 
 26
 The Court rejected this cost-benefit argument as inconsistent with the language of section 6(b)(5), holding that the "plain meaning" of the word "feasible" is "capable of being done, executed, or effected." 452 U.S. at 508, 101 S.Ct. at 2490, 69 L.Ed.2d at 201.
 
 
 27
 Thus, Sec. 6(b)(5) directs the Secretary to issue the standard that "most adequately assures ... that no employee will suffer material impairment of health," limited only by the extent to which this is "capable of being done." In effect then, as the Court of Appeals held, Congress itself defined the basic relationship between costs and benefits, by placing the "benefit" of worker health above all other considerations save those making attainment of this "benefit" unachievable. Any standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the command set forth by Sec. 6(b)(5). Thus, cost-benefit analysis by OSHA is not required by the statute because feasibility analysis is.
 
 
 28
 (Footnote and citation omitted.) 452 U.S. at 509, 101 S.Ct. at 2490, 69 L.Ed.2d at 202.
 
 
 29
 The parties dispute the effect of this analysis on the instant case. Castle & Cooke would avoid the impact of American Textile by arguing that its definition of "feasible" applies only to that part of the standard that sets permissible exposure levels, but not to the element of the standard that defines the means employers must implement to abate excess exposure levels. This argument ignores both the logic of American Textile and the clear language of section 3(8), 29 U.S.C. Sec. 652(8), which defines standards as conditions, practices, means or methods.
 
 
 30
 The Secretary argues that because section 6(b)(5), as defined in American Textile, and 29 C.F.R. Sec. 1910.95(b)(1) both use the term "feasible," there is a "natural presumption" that identical words used in different parts of the same act are intended to have the same meaning. The Secretary may not claim the benefit of this presumption. The regulation is not a legislative enactment. Moreover, critical differences distinguish section 6(b)(5) and section 6(a), from which 29 C.F.R. Sec. 1910.95 is derived. The term "feasible," added by Congress to section 6(b)(5), does not appear in the other subsections of section 6. The clear implication is that Congress intended in section 6(b)(5) to give the Secretary the additional grant of authority necessary to protect employees against the most serious health hazards. See American Textile, 452 U.S. at 512, 101 S.Ct. at 2492, 69 L.Ed. at 204. As a result, standards promulgated under section 6(b)(5) are a distinct "species of the genus of standards governed by the basic requirement" of the Act. Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 642, 100 S.Ct. 2844, 2864, 65 L.Ed.2d 1010, 1035 (1980) (plurality opinion).
 
 
 31
 The subsections of section 6 are also distinguishable by their relationship to section 3(8), 29 U.S.C. Sec. 652(8). The Court concluded in Industrial Union that section 3(8)'s definition of a standard was incorporated by reference into section 6(b)(5). 448 U.S. at 642, 100 S.Ct. at 2864, 65 L.Ed.2d at 1035. In American Textile, however, it determined that the general requirement of section 3(8) that all standards be "reasonably necessary or appropriate" could not be read to countermand the stricter and more specific requirement imposed by section 6(b)(5). The Court therefore rejected the cotton industry's argument that section 3(8) superimposed a requirement of cost-benefit analysis on the issuance of section 6(b)(5) standards. "Congress did not contemplate any further balancing by the agency for toxic material and harmful physical agents standards, and we should not 'impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.' " American Textile, 452 U.S. at 512, 101 S.Ct. at 2492, 69 L.Ed.2d at 204, quoting Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973) (emphasis added).
 
 
 32
 However, the Court expressly left open the question of how section 3(8)'s "reasonably necessary" requirement might limit the promulgation or enforcement of standards not dealing with toxic substances or harmful physical agents: "[t]his is not to say that Sec. 3(8) might not require the balancing of costs and benefits for standards promulgated under provisions other than Sec. 6(b)(5) of the Act." 452 U.S. at 513, 101 S.Ct. at 2493, 69 L.Ed.2d at 205 n. 32 (emphasis added). Because the Court specifically declined to apply its definition of feasible to regulations promulgated under section 6(a), we conclude that American Textile does not control the Commission's interpretation of 29 C.F.R. Sec. 1910.95(b)(1) or of the statutes that authorized its promulgation. The Commission was thus free to exercise its authority to interpret the regulations it is charged with enforcing.
 
 
 33
 We view the Commission's interpretation of "feasible" as a reasonable reconciliation of the regulation's language and the statute's "reasonably necessary" requirement. In requiring employers to implement economically feasible engineering controls, the regulation would require only those controls that are "reasonably necessary and appropriate" to protect employees' health and safety. The Commission has concluded that a control is not reasonably necessary and appropriate if the benefits to be gained by employees do not justify the cost. This interpretation of section 3(8) is neither unreasonable, arbitrary, nor an extension of the authority granted the Commission by the Act.[9]
 
 
 34
 The Secretary warns that approval of the Commission's test of feasibility will undermine the central goal of the Act, which is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions ...." 29 U.S.C. Sec. 651(b). We disagree. The test of feasibility advanced by the Secretary, that controls are infeasible only if they threaten the employer's financial viability, offers less protection to the worker than does the Commission's approach. It conditions employee health and safety on the employer's financial viability and thus arguably exempts some employers from providing necessary protection. The Commission's test emphasizes benefits to be gained by employees and does not excuse or exempt marginal employers who cannot adequately protect employees. At the same time, the Commission's test provides a realistic view of the range of hazards from which employees require protection and the alternate means of providing that protection, and recognizes that the Act does not "require employers to provide absolutely risk-free workplaces whenever it is technologically feasible to do so...." Industrial Union, 448 U.S. at 641, 100 S.Ct. at 2863, 65 L.Ed.2d at 1034.
 
 
 35
 The Secretary next contends that, regardless of how "feasible" is to be interpreted, the burden of establishing economic infeasibility should be placed on the employer. The Commission recognized this issue, but did not resolve it.
 
 
 36
 In an enforcement proceeding where infeasibility is raised as an affirmative defense, the burden of proof does lie with the employer. See Greyhound Lines-West v. Marshall, 575 F.2d 759, 762 (9th Cir.1978); see also Nothstein, The Law of Occupational Safety and Health, 436 (1981). However, where the standard makes feasibility an element of the violation, the burden of proving that controls are feasible is on the Secretary. Carnation Co. v. Secretary of Labor, 641 F.2d 801, 803 (9th Cir.1981); see Diversified Industries Division, Independent Stave Co. v. OSHRC, 618 F.2d 30, 32 (8th Cir.1980); RMI Co. v. Secretary of Labor, 594 F.2d 566, 574 (6th Cir.1979); 29 C.F.R. Sec. 2200.73(a) (1981) ("In all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary.").
 
 
 37
 Castle & Cooke was cited for failure to implement feasible engineering controls. Proof of feasibility was therefore the Secretary's burden. However, as we noted in Carnation Co., 641 F.2d at 803, realism and common sense should dictate how the Secretary may meet his burden of providing substantial evidence of feasibility. "It would be a waste of government money and energy to compel the Secretary to prove the economic feasibility of [engineering] controls where there is no suggestion by the violator that such controls would be economically infeasible." Id.
 
 
 38
 We therefore hold that when the Secretary seeks enforcement of a citation alleging a violation of 29 C.F.R. Sec. 1910.95(b)(1), he bears an initial burden of showing that technologically feasible engineering controls are available to the cited employer. Although the Secretary will generally have access to information on the average development and installation cost of the proposed controls, he will not have knowledge of the specific economic impact implementation of the controls will have on the cited employer. Therefore, once the Secretary meets his initial burden, the burden must shift to the employer, who may raise the issue of economic feasibility. The employer may satisfy this burden of production with evidence of the relative cost to him of various methods of noise control. That is, the employer may compare the costs of implementing engineering controls, administrative controls, or personal protective equipment at a specific employment location. If the employer raises the question of economic feasibility in this manner, the burden of proof returns to the Secretary, who must establish that the benefit of the proposed engineering controls justifies their relative cost in comparison to other abatement methods.
 
 
 39
 In this case, the Secretary carried his initial burden. Both the Secretary's expert, Mr. Kugler, and Castle & Cooke's expert, Mr. Pack, testified that technologically feasible engineering controls, in the form of machine enclosures, were available to Castle & Cooke.
 
 
 40
 Castle & Cooke also satisfied its initial burden. Castle & Cooke produced evidence that development and installation of the proposed engineering controls would cost approximately $700,000, and that loss of production due to the controls would cost an additional estimated $250,000 annually. Castle & Cooke also produced evidence that the maximum estimated annual cost for providing personal protective ear devices was approximately $1,000. This evidence was sufficient to raise the feasibility issue.
 
 
 41
 The burden thus returned to the Secretary to show that requiring implementation of the significantly more expensive engineering controls was justified by the benefits that would accrue to Castle & Cooke's employees. The Secretary admitted that Castle & Cooke had developed and implemented "an effective mandatory personal ear protection program which reduces noise levels to within the levels set forth in Table G-16 of the Standard." Although the Secretary challenged use of ear plugs and ear muffs in general, he did not attempt to demonstrate that Castle & Cooke employees were not adequately protected by these devices. Moreover, the testimony of Castle & Cooke's medical expert, Dr. Lebo, put in question many of the Secretary's claims as to the general disadvantages of personal protective equipment. In addition, the Secretary's acoustical expert testified that the proposed engineering controls might not be successful in reducing noise to required levels. Based on this evidence, we cannot say the Commission erred in concluding that the Secretary did not carry his burden of proof of the economic feasibility of the proposed controls.
 
 
 42
 The decision of the Commission vacating the citation is AFFIRMED.
 
 
 
 [1]
 29 C.F.R. Sec. 1910.95(b)(1) provides:
 When employees are subjected to sound exceeding those listed in Table G-16, feasible administrative or engineering controls shall be utilized. If such controls fail to reduce sound levels within the levels of Table G-16, personal protective equipment shall be provided and used to reduce sound levels within the levels of the table.
 
 
 [2]
 The regulation contemplates three types of noise controls. Engineering controls are those that reduce the sound intensity at the source of the noise. This is achieved by insulation of the machine, by substituting quieter machines and processes, or by isolating the machine or its operator
 Administrative controls attempt to reduce workers' exposure to excess noise through use of variable work schedules, variable assignments, or limiting machine use.
 Personal protective equipment includes such devices as ear plugs and ear muffs provided by the employer and fitted to individual workers.
 See United States Department of Labor, Guidelines to the Department of Labor's Occupational Noise Standards for Federal Supply Contracts (1970).
 
 
 [3]
 The parties stipulated that administrative controls were not feasible in the can plant and cannery. We therefore consider only the two remaining noise control options--engineering controls and personal protective equipment
 
 
 [4]
 Chairman Barnako wrote the majority opinion, relying upon the Commission's earlier decision in Continental Can Co., 76 OSAHRC 109/A2, 4 OSHC 1541, 1976-77 OSHD para. 21,009 (1976), to conclude that "economic feasibility [is] instead to be evaluated in terms of the relevant cost and benefit factors shown by the record."
 In a separate concurring opinion, Commissioner Moran agreed that the Secretary had not shown that implementation of the proposed controls was economically feasible. Although he also felt a cost-benefit analysis was appropriate, he disagreed with the factors considered in Chairman Barnako's analysis.
 Commissioner Cleary dissented, challenging the majority's cost-benefit analysis as overly simplistic. His view was that comprehensive cost-benefit analysis was better considered as part of the rulemaking procedure, rather than in an enforcement proceeding. As does the Secretary, Commissioner Cleary argued that consideration of costs would always result in a preference for personal protective equipment, which would invariably cost less than engineering controls. In our view, this argument ignores the benefit portion of the cost-benefit equation.
 For an analysis of the differing views of Commission members on this issue, see Nothstein, The Law of Occupational Safety and Health, 440-43 (1981).
 
 
 [5]
 29 U.S.C. Sec. 655(a) provides:
 Without regard to chapter 5 of Title 5 or to the other subsections of this section, the Secretary shall, as soon as practicable during the period beginning with the effective date of this chapter and ending two years after such date, by rule promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. In the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees.
 
 
 [6]
 Section 3(9), 29 U.S.C. Sec. 652(9) provides:
 The term "national consensus standard" means any occupational safety and health standard or modification thereof which (1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies.
 
 
 [7]
 The Secretary characterizes section 3(8) as a general definitional provision that is without meaning in the context of the noise standards. He views subsections (8), (9), and (10) as alternative provisions, of which only subsection (10) can have application here in that the standard in question is an established federal standard
 The Supreme Court has firmly rejected the argument that section 3(8) is merely a definitional statute without substantive content. American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 513 n. 32, 101 S.Ct. 2478, 2493 n. 32, 69 L.Ed.2d 185, 205 n. 32 (1981); Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 640 n. 45, 100 S.Ct. 2844, 2863 n. 45, 65 L.Ed.2d 1010, 1034 n. 45 (1980) (plurality opinion). "Occupational safety and health standard" is a critical operational term in the Act, and it is defined in section 3(8) in a manner that guides and limits the Secretary's rulemaking authority. Id.
 Furthermore, the faulty logic of the Secretary's argument is exposed by the language of section 5, 29 U.S.C. Sec. 654, and section 6(a), 29 U.S.C. Sec. 655(a), both of which describe "occupational safety and health standards" as the general class of standards, of which "established federal standards" are one type. Under the Secretary's interpretation, an employer who failed to comply with a section 3(10) standard would not be liable under section 5.
 
 
 [8]
 Feasibility is a question of fact reviewable under the substantial evidence standard. See Diversified Industries, 618 F.2d at 32; Marshall v. West Point Pepperell, Inc., 588 F.2d 979, 984 (5th Cir.1979)
 
 
 [9]
 The application of cost-benefit analysis to this regulation has also been approved by the Sixth Circuit, RMI Co. v. Secretary of Labor, 594 F.2d 566 (1979), and the Seventh Circuit, International Harvester Co. v. OSHRC, 628 F.2d 982 (1980); Turner Co., Division of Olin Corp. v. Secretary of Labor, 561 F.2d 82 (1977)