725 F.2d 1237
 11 O.S.H. Cas.(BNA) 1769, 1984 O.S.H.D. (CCH)
P 26,800
 PHELPS DODGE CORPORATION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Raymond J.
Donovan, Secretary of Labor, and United
Steelworkers of America, AFL-CIO, and
Local Union 616, Respondents.
 No. 83-7321.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 11, 1984.
Decided Feb. 14, 1984.
 
 Stephen W. Pogson, Evans, Kitchel & Jenckes, Phoenix, Ariz., for petitioner.
 Andrea Casson, Mary Win-O'Brien, U.S. Dept. of Labor, Washington, D.C., for respondents.
 On Petition for Review of Decision of the Occupational Safety and Health Review Commission.
 Before ANDERSON, SKOPIL and FERGUSON, Circuit Judges.
 FERGUSON, Circuit Judge.
 
 
 1
 Phelps Dodge Corporation appeals from the decision of the Occupational Safety and Health Review Commission (the Commission) upholding a citation for violation of the inorganic arsenic standard, 29 C.F.R. Sec. 1910.1018. On appeal we are asked to determine whether the inorganic arsenic standard requires an employer to compensate employees for their time and to assume the costs incurred by employees in taking medical examinations scheduled during nonworking hours; whether such a standard is a valid exercise of the Secretary of Labor's authority under the Occupational Safety and Health Act (the Act), 29 U.S.C. Sec. 651 et seq.; and whether Phelps Dodge's violation of the standard was "serious" within the meaning of the Act.
 
 FACTS
 
 2
 On August 1, 1978, a final Occupational Safety and Health Administration (OSHA) standard regulating employee exposure to inorganic arsenic became effective after publication and a comment period. 29 C.F.R. Sec. 1910.1018 (the standard). Under this standard, employers are required to provide medical examinations to employees who may be exposed to inorganic arsenic "without cost to the employee, without loss of pay and at a reasonable time and place." 29 C.F.R. Sec. 1910.1018(n)(1)(ii). An earlier proposed version of the standard had included the requirement that all medical examinations be given during the employees' normal working hours. The preamble to the final standard (hereafter "preamble") explained the change:
 
 
 3
 The final standard does not include the requirement because it may be impractical for shift workers or less convenient for employee or employer. However the employer is obligated to pay for the time spent taking the medical examination if it is taken outside normal working hours and the exam must be given at a reasonable time and place. It is necessary that exams be convenient and without loss to the employee to assure that they are taken.
 
 
 4
 43 Fed.Reg. 19,621 (1978).
 
 
 5
 Phelps Dodge scheduled the first set of examinations during working hours. Employees were taken to and from the hospital at company expense and received their normal pay during transportation, waiting, and examination time. Employee participation was 100%.
 
 
 6
 Phelps Dodge scheduled subsequent examinations at times outside working hours at a hospital about a mile from the work site. The company paid for the examinations, but employees provided their own transportation and were not compensated for their time. The tests themselves took about fifteen minutes; the actual time required, including transportation and waiting, was an hour or more. Employee participation in the 1979 tests dropped to 58%. Employee reasons for nonparticipation included the cost of extra transportation for those employees who commuted in van pools and personal responsibilities including childcare.
 
 
 7
 The United Steel Workers of America filed a complaint with OSHA for the company's failure to provide the examinations without cost to the employees. After inspection, the Secretary issued a citation to Phelps Dodge for violating the inorganic arsenic standard, 29 C.F.R. Sec. 1910.1018(n)(1)(ii). The union was granted party status after the company contested the citation. After a hearing the administrative law judge (ALJ) sustained the citation. The ALJ concluded that Phelps Dodge's failure to provide the examinations at a reasonable time and without cost was a nonserious violation of the standard.
 
 
 8
 Both Phelps Dodge and the Secretary requested review by the Commission pursuant to 29 C.F.R. Sec. 2200.91. The Commission found that the examinations had been provided at a reasonable time, but affirmed the ALJ's finding that the employer had failed to provide the examinations without cost to the employees. The Commission further found that the violation was serious within the meaning of the Act. The penalty was fixed at $100.
 
 
 9
 Phelps Dodge filed a timely notice of appeal. This court has jurisdiction under 29 U.S.C. Sec. 660(a).
 
 ANALYSIS
 1. Standards of Review
 
 10
 In an enforcement challenge to an OSHA standard, this court accords the Secretary's decisions substantial weight, especially when those decisions have been affirmed by the Commission. Donovan v. Castle & Cooke Foods, 692 F.2d 641, 646 (9th Cir.1982). Unless the decision is arbitrary and capricious, not in accordance with law, or exceeds authority granted by the Act, it will be upheld. Id. at 645; Arkansas-Best Freight Systems Inc. v. OSHRC, 529 F.2d 649, 653 (8th Cir.1976). We review the Commission's factual finding that Phelps Dodge committed a serious violation of the Act under the substantial evidence standard and accept reasonable factual inferences drawn by the Commission. 29 U.S.C. Sec. 660(a); Modern Drop Forge Co. v. Secretary of Labor, 683 F.2d 1105, 1109 (7th Cir.1982). On the question of the meaning of "serious" as defined by the statute, this court's role is to decide whether the Commission's interpretation is unreasonable and inconsistent with the purpose of the Act. See, e.g., Brennan v. OSHRC, 491 F.2d 1340, 1343 (2d Cir.1974).
 
 
 11
 2. The Secretary's Interpretation of the Standard
 
 
 12
 Phelps Dodge first contends that the Commission and the Secretary erred in interpreting the standard to require the employer to compensate employees for their time and for transportation expenses associated with taking the medical examinations. Phelps Dodge asserts that the standard is clear and unambiguous: The phrase "without cost to the employee" refers only to the cost of the medical examination itself, not to employees' associated expenses, and the phrase "without loss of pay" means only that employees must be paid in the event the employer chooses to provide examinations during working hours.
 
 
 13
 Under the appropriate deferential standard of review, this court examines whether the Secretary's interpretation of the standard was arbitrary and capricious. The word "cost" has many common meanings. Here, the Secretary interpreted the phrase "without cost" in a broad sense in accordance with the preamble's statement that the exams be given "without loss to the employee to assure that they are taken." The dramatic drop in employee participation after employees were required to take examinations on their own time and to provide their own transportation demonstrates the reasonableness of the Secretary's interpretation. We affirm the decision of the Commission.
 
 3. Validity of the Standard
 
 14
 Phelps Dodge next questions whether the Act authorizes the Secretary to allocate such costs to the employer. The starting point of our analysis is the language of the statute itself. American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 508, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981). Congress granted the Secretary the specific authority to promulgate appropriate standards which "prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to [toxic substances] in order to most effectively determine whether the health of such employees is adversely affected by such exposure." 29 U.S.C. Sec. 655(b)(7). In United Steelworkers of America v. Marshall, 647 F.2d 1189 (D.C.Cir.), cert. denied, 453 U.S. 913, 101 S.Ct. 3149, 69 L.Ed.2d 997 (1981), in reviewing the OSHA lead standard, 29 C.F.R. Sec. 1910.1025, the court observed that the Act gave the Secretary "almost unlimited discretion to devise means to achieve the congressionally mandated goal of protecting employee health." Id. at 1230. Interpreting the scope of 29 U.S.C. Sec. 655(b)(7), the court concluded that the section is a "rather broad mandate to OSHA to charge to employers whatever scheme of medical review it deems reasonably necessary." Id. at 1239-40. The legislative history of the Act does not contain any discussion of the meaning of costs within section 655(b)(7). However, in the purpose and policy statement of the Act, Congress expressed its intent to exercise its powers to provide safe and healthful working conditions by "providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience." 29 U.S.C. Sec. 651(b)(7). It is clear that Congress contemplated that the Act would shift the costs of protecting employees' health to employers. In American Textile Manufacturers Institute Inc., the Supreme Court reviewed the OSHA standard regulating occupational exposure to cotton dust, 29 C.F.R. Sec. 1910.1043. The Court found that the Act's legislative history "demonstrates conclusively that Congress was fully aware that the Act would impose real and substantial costs of compliance on industry, and believed that such costs were part of the cost of doing business." American Textile Manufacturers Institute, Inc., 452 U.S. at 514, 101 S.Ct. at 2493.
 
 
 15
 As a prerequisite to formulating standards, the Secretary must articulate the health-related need for such standards. 29 U.S.C. Sec. 655(e). The Secretary did so in the preamble to the standard. 43 Fed.Reg. 19620-21 (1978).
 
 
 16
 We agree with the Commission that the standard is consistent both with the face of the statute and with the mandate of the legislative history.
 
 4. The Seriousness of the Violation
 Under the Act, a violation is serious
 
 17
 if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 
 
 18
 29 U.S.C. Sec. 666(j). Phelps Dodge contends that the Commission erred in finding that the violation was serious. Phelps Dodge interprets the statute to require that to be serious, the violation must potentially cause physical harm. This interpretation is erroneous. Rather, the court looks to the harm the regulation was intended to prevent, and if that harm is death or serious physical injury, a violation of the regulation is serious per se. California Stevedore and Ballast Co. v. OSHRC, 517 F.2d 986, 988 & n. 1 (9th Cir.1975).
 
 
 19
 Here the Commission reviewed the medical evidence of carcinogenicity and other adverse health effects of inorganic arsenic in the preamble to the standard, and noted that there is no known safe level of exposure. The Commission concluded that the standard "is designed to protect employees against the contraction or progression of serious illnesses by requiring medical surveillance procedures that would permit early detection of such illnesses." We hold that substantial evidence supported the Commission's determination that death or serious illness could ensue as a result of Phelps Dodge's failure to provide physical examinations "without cost." The Commission properly found that Phelps Dodge's violation was serious.
 
 
 20
 The decision of the OSHRC is AFFIRMED.